**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| *In re Barnes & Noble Pin Pad Litigation* | ) ) ) ) ) ) ) ) | Case No. 12-cv-8617 |
| | | Hon. John W. Darrah |
| | | Magistrate Judge Schenkier |
| | | **JURY TRIAL DEMANDED** |

## CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Ray Clutts ("Clutts"), Heather Dieffenbach ("Dieffenbach"), Jonathan Honor ("Honor"), and Susan Winstead ("Winstead") (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against defendant Barnes & Noble, Inc. ("Defendant" or "Barnes & Noble"), and complain and allege upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

## I.   NATURE OF THE ACTION

1.    Plaintiffs bring this class action against Barnes & Noble for its failure to secure and safeguard its customers' personal financial data—including, but not limited to, credit and debit card information, personal identification numbers ("PIN"), and Plaintiffs' and Class members' names (collectively, "Personal identifying information" or "PII")—and failure to provide clear, conspicuous, and timely notice to Plaintiffs and the other members of the Class that their information had been stolen.

2.    On October 24, 2012, nearly six weeks after Barnes & Noble allegedly discovered what it has described as a "sophisticated criminal effort to steal credit card information, debit card information, and debit card PIN numbers from customers who swiped their cards through

PIN pads when they made purchases," Barnes & Noble began disclosing to the public that these alleged criminals (referred to herein as "skimmers") infiltrated Barnes & Noble's flawed payment security system by tampering with PIN pad devices at 63 separate Barnes & Noble stores, enabling them to steal Barnes & Noble's customers' PII (the "Security Breach").

3.     Barnes & Noble's security failures enabled the skimmers to steal Plaintiffs' and Class members' PII from within Barnes & Noble's stores and subsequently make unauthorized purchases on customers' credit cards and otherwise put Plaintiffs' and Class members' financial information at serious and ongoing risk. The skimmers continue to use the information they obtained as a result of Barnes & Noble's inadequate security to exploit and injure Plaintiffs and Class members across the United States.

4.     The Security Breach was caused and enabled by Barnes & Noble's knowing violation of its contractual obligations to abide by best practices and industry standards concerning the security of PIN pad terminals. Barnes & Noble grossly failed to comply with security standards and allowed its customers' financial information to be compromised by cutting corners on security measures that could have prevented or mitigated the Security Breach that occurred.

5.     Barnes & Noble failed to disclose the extent of the Security Breach, failed to individually notify each of its affected customers of the Security Breach in a timely manner, and failed to take other reasonable steps to clearly and conspicuously inform Plaintiffs and Class members of the nature and extent of the Security Breach. By failing to provide adequate notice, Barnes & Noble prevented Plaintiffs and Class members from protecting themselves from the Security Breach.

6.     Accordingly, Plaintiffs, on behalf of themselves and other members of the Class,

assert claims for breach of implied contract, violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/1, *et seq.* (and other similar deceptive and unfair practices acts), invasion of privacy, violation of California Civil Code § 1798.80, *et seq.*, and violation of the Unfair Competition Act, Business & Professions Code § 17200, *et seq.*, and seek injunctive relief, declaratory relief, monetary damages, statutory damages, and all other relief as authorized in equity or by law.

## II.    JURISDICTION AND VENUE

7.    The Court has jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2) ("CAFA"), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

8.    The Court has personal jurisdiction over Barnes & Noble, because Barnes & Noble is registered with the Illinois Secretary of State to conduct business in the State of Illinois and does conduct substantial business in the State of Illinois, such that Barnes & Noble has significant continuous and pervasive contacts with the State of Illinois. Barnes & Noble also maintains numerous stores and employees in the State of Illinois, including multiple stores compromised in the Security Breach.

9.    Venue is proper in this District under 28 U.S.C. §§ 1301(a)(2), 1391(b)(2), and 1391(c)(2) because: a substantial part of the events and/or omissions giving rise to the claims emanated from activities within this District, Barnes & Noble conducts substantial business in this District, and seven store locations in this District were identified by Barnes & Noble as having PIN pads that were tampered with during the Security Breach.

### III.   PARTIES

*Plaintiff Clutts*

10.     Ray Clutts is a citizen of Illinois and resides in Lake County, Illinois. Clutts shopped at an affected Barnes & Noble retail location in Illinois prior to September 14, 2012. Clutts made at least one purchase at the Barnes & Noble store in Deer Park, Illinois. Clutts swiped his debit card through one of that store's PIN pad terminals and, as a result, entered into an implied contract with Barnes & Noble for the adequate protection of his debit card information, and had his PII exposed as a result of Barnes & Noble's inadequate security. Barnes & Noble did not provide Clutts with timely or effective notification about the Security Breach.

*Plaintiff Dieffenbach*

11.     Heather Dieffenbach is a citizen of California and resides in Los Angeles County, California. Dieffenbach shopped at an affected Barnes & Noble retail location in California prior to September 14, 2012. On numerous occasions prior to September 14, 2012, Dieffenbach was a customer of and made purchases at Barnes & Nobles' Calabasas, California, location, which is one of the locations in Southern California where Barnes & Noble admits PIN pads had been tampered with. On at least one of those occasions, Dieffenbach swiped her debit card through one of the store's PIN pad terminals and, as a result, entered into an implied contract with Barnes & Noble for the adequate protection of her debit card information, and had her PII exposed as a result of Barnes & Noble's inadequate security. Barnes & Noble did not provide Dieffenbach with timely or effective notification about the Security Breach. Dieffenbach has suffered emotional distress from the Security Breach, including, among other things, anxiety.

*Plaintiff Honor*

12.     Jonathan Honor is a citizen of Illinois and resides in Cook County, Illinois. Honor

shopped at an affected Barnes & Noble retail location in Illinois prior to September 14, 2012. Honor made at least one purchase at the Barnes & Noble located at 1441 West Webster Avenue, Chicago, Illinois. Honor swiped his debit card through one of that store's PIN pad terminals and, as a result, entered into an implied contract with Barnes & Noble for the adequate protection of his debit card information, and had his PII exposed as a result of Barnes & Noble's inadequate security. Barnes & Noble did not provide Honor with timely or effective notification about the Security Breach.

***Plaintiff Winstead***

13.     Susan Winstead is a citizen of Illinois and resides in Lake County, Illinois. Winstead shopped at an affected Barnes & Noble retail location in Illinois prior to September 14, 2012. Winstead made frequent purchases at the Barnes & Noble store in Deerfield, Illinois, including two purchases in August 2012, and one in the first week of September 2012. On at least one of those occasions, Winstead swiped her credit card through one of the store's PIN pad terminals and had her PII exposed as a result of Barnes & Noble's inadequate security. Barnes & Noble did not provide Winstead with any notification about the Security Breach.

14.     Near the end of September 2012, after her last purchase at the affected Barnes & Noble store in Deerfield, Illinois, Winstead received a call from a representative of her credit card company about a potentially fraudulent charge on her credit card. Winstead confirmed that the charge was fraudulent and her credit card company deactivated her credit card. Winstead was without use of her credit card until a replacement card arrived.

***Defendant***

15.     Barnes & Noble, Inc., is a Delaware corporation with its principal place of business in New York, New York. Barnes & Noble is America's largest book retailer, operating

nearly 700 retail stores across the country. Barnes & Noble sells books, eBooks, Nook devices (eBook readers), magazines, food and beverages, and other items. Between its retail stores and its online operations, Barnes & Noble sells approximately 300 million books per year.

## IV.    FACTUAL BACKGROUND

*PIN Pad "Skimming"*

16.    Like many other retailers, Barnes & Noble uses PIN pad terminals to process its customers' in-store credit and debit card payments.

17.    A PIN pad is an electronic device used in a debit or credit card-based transaction. To make a debit or credit card purchase through a PIN pad, a cardholder swipes their credit or debit card through the PIN pad (and, for debit card transactions, then inputs his or her PIN). A properly operating PIN pad will then encrypt the cardholder's card information and PIN, temporarily store the encrypted card information and PIN—along with other card and transaction information—and transmit that information to a transaction manager or bank for verification to complete the transaction.

18.    "Skimming" is a form of electronic system hacking that enables the unauthorized capture of credit and debit card magnetic strip data by unauthorized persons. These unauthorized persons are often referred to as "skimmers." In order to make use of the magnetic strip data on a debit card, skimmers generally require knowledge of the cardholders' PIN.

19.    Once skimmers acquire a cardholder's magnetic strip information and PIN, they may then use that information to commit identity theft and other fraudulent scams, including, but not limited to, selling that information online or using it to create a fraudulent duplicate card. Skimmers can create duplicate cards in seconds, using card cloning hardware that can be purchased online. With the duplicate in hand, skimmers or their confederates use the fraudulent

duplicate card together with the stolen PIN (for debit cards) to make unauthorized purchases or withdraw cash directly from the victim's bank accounts via an ATM.

20.     One method that skimmers use to obtain their victims' credit and debit card information and PIN numbers involves implanting small electronic detection devices, or "bugs," within the physical PIN pads themselves. Using this method, the skimmers are able to extract the customer's payment card information and PIN when the customer swipes his or her card through the PIN pad terminal. Because the exterior of an inadequately secured PIN pad typically shows no evidence of the modification—which is entirely inside the machine—this form of tampering can be particularly hard to detect and can often go unnoticed for an extended period of time.

21.     The payment card industry, the PIN pad industry, and merchants have been aware of this method for some time, however, and have developed industry best practices and contractual standards that provide greater PIN pad security (including, but not limited to, tamper-proof seals on PIN pad devices, proper employee supervision of PIN pad devices, and regular PIN pad inspections) that help protect against this particular type of unauthorized PIN pad tampering.

***Barnes & Noble's Contractual Obligation to Protect Customer Information***

22.     Barnes & Noble accepts customer payments for purchases through credit and debit cards issued by members of the payment card industry ("PCI"), such as Visa USA ("Visa"), MasterCard, Discover, and American Express. Some card issuers, such as Visa, contractually obligate merchants, such as Barnes & Noble, to comply with various PIN pad security standards that protect customer financial information as a condition of being permitted to process transactions through the card issuer.

23.     At all times relevant to this action, Barnes & Noble was authorized by Visa to

accept Visa credit and debit cards for the payment of personal goods.

24.     Visa is a privately-held for profit association that supplies and supports Visa credit and debit cards issued by financial institutions to their customers by providing an authorization service for Visa card transactions and a clearing and settlement service to transfer payment information between parties involved in credit and debit card transactions. Visa is a member of the PCI.

25.     In 2005, Visa issued a global mandate ("Visa's Global Mandate"), requiring that by July 1, 2010, each of its merchants authorized to accept payment through Visa credit and debit cards discontinue the use of PIN pad terminals that do not meet the Triple Data Encryption Standard ("TDES"). TDES compliant devices provide greater security than earlier generation devices. With respect to the enhanced security protections of Visa's Global Mandate, David Ottenheimer, a payments security expert who works with the technology consultancy K3DES LLC recently noted the importance of upgrading to tamper resistant equipment, stating: "If you have a device that's five years old, it probably doesn't have the protections that it would need" to ward off fraud.

26.     Barnes & Noble is contractually obligated to fully comply with Visa's Global Mandate as a condition of being permitted to process transactions through the Visa network.

27.     Visa also created operating regulations for merchants who elected to accept its cards, which included a list of thirty-two requirements that those merchants must implement to protect the security of cardholder information (the "PCI PIN Security Requirements").[1]

28.     The PCI PIN Security Requirements include the following:

---

[1]     *See Payment Card Industry PIN Security Requirements, version 2.0* (January 2008), located at http://usa.visa.com/download/merchants/pci_pin_security_requirements_2008.pdf (last visited Mar. 25, 2013).

- Requirement 1. "All cardholder-entered PINs are processed in equipment that conforms to the requirements for tamper-resistant security modules."

- Requirement 29. "PIN-processing equipment is placed into service only if there is assurance that the equipment has not been substituted or made subject to unauthorized modifications or tampering prior to the loading of cryptographic keys." Visa further notes that, in compliance with international and industry standards, merchants must implement procedures that "*include ensuring that a counterfeit device possessing all the correct operational characteristics plus fraudulent capabilities has not been substituted for a legitimate device*."

- Requirement 32. "Documented procedures exist and are demonstrably in use to ensure the security and integrity of PIN-processing equipment placed into service, initialized, deployed, used, and decommissioned."

29. Barnes & Noble is contractually obligated to fully comply with the PCI PIN Security Requirements as a condition of being permitted to process transactions through the Visa network.

30. Visa warns that "merchant non-compliance (with the PCI PIN Security Requirements) could potentially subject the Visa payment system to an extremely high level of risk."[2] Similarly, a merchant's non-compliance with the PCI PIN Security Requirements subjects its customers to an extremely high level of risk.

31. In 2006, Visa, MasterCard, and other PCI members established the Security Standards Council ("PCI SSC"). PCI SSC is an open global forum responsible for the development, management, education, and awareness of PCI Data Security Standard and related standards for increased security of PIN pad terminals.

32. In addition to developing security standards applicable to payment card processing generally, PCI SSC developed even more stringent standards for PIN pad terminals (referred to by the PCI SSC as "PCI PIN Entry Devices" or "PCI PEDs") in order, among other

---

[2] *See Visa PIN Security, Tools and Best Practices for Merchants*, at 3, located at http://usa.visa.com/download/merchants/pin-security-080507-final.pdf (last visited Mar. 25, 2013).

things, to make PIN pad terminals more tamper-resistant.[3]

33.     Since December 31, 2007, PCI members require that merchants who accept their credit or debit cards do not put into service PIN pad terminals that fail to meet the PCI PED standard.[4]

34.     Barnes & Noble is contractually obligated—as a condition of being permitted to process transactions through PCI companies—to fully comply with the PCI PED requirements and other requirements concerning the security of customer financial information.

***Industry Standard Practices***

35.     PCI SCC, PIN pad manufacturers, and credit card processors have developed and implemented a series of "best practices" for merchants to prevent or identify instances of PIN pad tampering.

36.     PCI SCC's best practices for preventing PIN pad terminal tampering include, but are not limited to, logging the serial numbers of the PIN pad terminals in the store and periodically inspecting those devices to ensure that they have not been substituted with tampered terminals.[5]

37.     Similarly, VeriFone, a leading manufacturer of PIN pad terminals warned merchants, such as Barnes & Noble, that older PIN pads can be tampered or "bugged" by skimmers and issued a series of best practices to increase security of PIN pad terminals.[6] The

---

[3]  *See Payment Card Industry PIN Security Requirements, version 2.0*, January 2008, at 77.

[4]  *Id.*

[5]  *See PCI Security Standards Council, Information Supplement:  Skimming Prevention—Best Practices for Merchants* (Aug. 2009), available at https://www.pcisecuritystandards.org/documents/skimming_prevention_IS.pdf  (last  visited  Mar.  25, 2013).

[6]  *See  VeriFone  PIN  Pad  Security  Best  Practices  v2*,  at  2,  available  at http://www.posdata.com/documents/PIN_Pad_Security_Best_Practices_V2.pdf  (last  visited  Mar.  25, 2013).

document notes:

> We are seeing an increase in criminal organizations targeting the less secure pre PED terminals by installing bugs to collect private credit card and debit information. In these cases, the criminal organizations are inserting a bug into an in-place device or obtaining the same terminal model that a retailer uses, installing a bug, and then substituting the tampered device for the retailer's terminals. They then either come back to retrieve these terminals to obtain the stolen information, or in some cases, the tampered terminals send the information to another computer via wireless communications.

> Due to repeated targeting of pre PED PIN pads and payment terminals, VeriFone has developed the following PIN Pad Security Best Practices. These best practices first enable a retailer to determine if any existing terminals have been tampered with, and second make tampering much more difficult by implementing a comprehensive set of security controls to prevent tampering and more quickly become aware if tampering has occurred.[7]

38. VeriFone's best practices include educating employees about skimming practices, preventing the unauthorized tampering or bugging of PIN pad terminals, and visually inspecting the terminals for signs of tampering.[8]

39. Steve Elefant, Chief Information Officer of credit card processor Heartland Payment Systems, noted that "[o]ne of the best practices stores need to think about is keeping track of the devices they have through video and individual employees, and verifying that people aren't . . . putting a skimmer in." Heartland Payment Systems offers PIN pad terminals to merchants that immediately discontinue service "the second they're modified." The company also monitors back-end traffic emanating from its PIN pads for unusual activity, such as unencrypted transactions.

40. Merchants that use modern PIN pad terminals and follow the requirements, standards, and best practices outlined above can protect their customers from security breaches like the one at issue here.

---

[7] *Id.* at 2.

[8] *Id.* at 3.

*Security Breaches Lead to Identity Theft*

41.     The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use personal identifying data to open financial accounts, receive government benefits and incur charges and credit in a person's name.[9] As the GAO Report states, this type of identity theft is the most harmful because it may take some time for the victim to become aware of the theft and can adversely impact the victim's credit rating. In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."

42.     According to the Federal Trade Commission ("FTC"), identity theft wreaks havoc on consumers' finances, credit history and reputation and can take time, money and patience to resolve.[10] Identity thieves use stolen personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[11]

43.     A person whose personal information has been compromised may not see any signs of identity theft for *years*. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.

---

[9]     *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), available at http:///www.gao.gov/new.items/d07737.pdf (last visited Mar. 25, 2013).

[10]    *See Taking Charge, What to Do If Your Identity is Stolen*, FTC, at 3 (2012), available at http://www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited Mar. 25, 2013).

[11]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

44.     PII—which includes Plaintiffs' and Class members' customer names combined with their credit or debit card information that were stolen in the Security Breach at issue in this action—is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for a number of years.[12] As a result of recent large-scale data breaches, identity thieves and cyber criminals have openly posted stolen credit card numbers and other PII directly on various Internet websites, making the information publicly available.

45.     In fact, "[a] quarter of consumers that received data breach letters [in 2012] wound up becoming a victim of identity fraud."[13]

**The Barnes & Noble Skimming Scam**

46.     On October 24, 2012—almost six weeks after Barnes & Noble allegedly discovered the wrongful conduct at issue in this litigation—Barnes & Noble reported that PIN pad tampering occurred in 63 of its stores, including seven of its Chicago-area stores. Barnes & Noble also revealed that prior to September 14, 2012, skimmers tampered with one device in each of those 63 stores, which are located in nine states. According to Barnes & Noble, the security breach affected PIN pad terminals at stores in 9 states:  California, Connecticut, Florida, Illinois, Massachusetts, New Jersey, New York, Pennsylvania, and Rhode Island.

47.     Barnes & Noble stated in its Press Release that by the close of business on September 14, 2012, it had disconnected all PIN pads from its stores nationwide.

48.     Barnes & Noble has reported that it does not know how many customers were

---

[12] Companies, in fact, also recognize PII as an extremely valuable commodity akin to a form of personal property. *See* T. Soma, *et al.*, *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *3–4 (2009).

[13] *One in Four that Receive Data Breach Letters Affected By Identity Theft*, available at http://blog.kaspersky.com/data-breach-letters-affected-by-identity-theft/ (last visited Mar. 25, 2013).

affected by the Security Breach and insists that its customer database has been secured. Yet, Barnes & Noble acknowledges that the skimmers have, in fact, made numerous unauthorized purchases on Class Members' credit cards.[14]

49.     On information and belief, at the time of the Security Breach, Barnes & Noble was not in compliance with Visa's Global Mandate that required the use of tamper-resistant PIN pads in all of its stores. Barnes & Noble also failed to comply with the PCI PIN Security Requirements.

50.     Barnes & Noble's failure to comply with Visa's Global Mandate and the PCI PIN Security Requirements provided Barnes & Noble with short-term and fleeting benefits in the form of saving on the costs of compliance, but at the expense and to the severe detriment of Barnes & Noble's own customers—including Plaintiffs and Class members here—who have been subject to the Security Breach or otherwise have had their financial information placed at serious and ongoing risk.

51.     Barnes & Noble allowed widespread and systematic theft of Plaintiffs' and Class members' PII. Barnes & Noble's actions did not come close to meeting the standards of commercially reasonable steps that should be taken to protect Plaintiffs' and Class members' PII. Despite being contractually obligated to do so, Barnes & Noble failed to employ appropriate technical, administrative, or physical procedures to protect Plaintiffs' and Class members' PII from unauthorized capture, dissemination, or misuse, thereby making Plaintiffs and Class members easy targets for theft and misuse of their financial information, including in the manner undertaken by the skimmers here.

---

[14]   Michael S. Schmidt, *Credit Card Breach at Barnes & Noble Stores*, The New York Times, available at http://www.nytimes.com/2012/10/24/business/hackers-get-credit-data-at-barnes-noble.html?_r=0 (last visited Mar. 25, 2013).

***Barnes & Noble Fails to Provide Sufficient Notice of the
Security Breach to Plaintiffs and Class Members***

52. On October 24, 2012—almost six weeks after Barnes & Noble allegedly first learned of the PIN pad terminal tampering—Barnes & Noble finally notified the press that a data breach occurred in its Chicago-area stores and more than 50 others.

53. The following day, Barnes & Noble posted a notice on its website stating that it had "detected a sophisticated criminal effort to steal credit and debit card information from our customers who have swiped their cards through PIN pads when they made purchases at certain retail stores."[15] The notice further states that Barnes & Noble "discovered this tampering during maintenance and inspection of the devices," and then worked with law enforcement to investigate the breach and conduct a "thorough internal review" of the PIN pads.[16]

54. Although the notice contains language designed to reassure the reader that "[c]ustomers can make transactions securely today by asking booksellers to swipe their cards,"[17] Barnes & Noble fails to acknowledge its failure to implement proper security measures *prior* to the breach—when it actually mattered.

55. Rather than take responsibility for its security failures that resulted in the Security Breach, Barnes & Noble has placed the burden on aggrieved customers like Plaintiffs and the other members of the Class, either to self-monitor their accounts and credit reports for years to come, or to spend time and money on fraud alerts or credit-report security freezes.

56. At no time has Barnes & Noble offered credit monitoring or identity theft

---

[15] *See* Barnes & Noble Press Release, *Barnes & Noble Detects Tampering with PIN pad Devices at Stores*, available at
 http://www.barnesandnobleinc.com/press_releases/10_23_12_Important_Customer_Notice.html (last visited Mar. 25, 2013).

[16] *Id.*

[17] *Id.*

protection assistance to Plaintiffs or the other members of the Class, nor has Barnes & Noble taken any affirmative steps to make Plaintiffs and Class members whole for the damages arising out of Barnes & Noble's conduct.

57. Plaintiffs and Class members are subject to continuing damage from having their PII compromised because of Barnes & Noble's inadequate security. Plaintiffs and Class members were and are entitled to clear, conspicuous, and prompt notification about the Security Breach to help them mitigate the harm and avoid additional instances of fraud as alleged herein. Barnes & Noble, however, has failed to take reasonable steps to notify Plaintiffs and Class members that their PII has been compromised.

58. Barnes & Noble has failed to directly notify Plaintiffs and Class members individually about the Security Breach, and has also failed to post signs in each of its affected stores to notify its returning customers that their financial information may have been compromised, that the skimmers may have stolen their credit and/or debit card information, and that, as a result of the Security Breach, they may be at risk of unauthorized credit and/or debit card charges and other fraudulent activity in the future.

***The Monetary Value of Privacy Protections and PII***

59. At a Federal Trade Commission ("FTC") public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's personal information:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy. Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[18]

---

[18] Federal Trade Commission Public Workshop, *The Information Marketplace: Merging and Exchanging Consumer Data*, available at http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited Mar. 25, 2013).

60.    Commissioner Swindle's 2001 remarks are even more relevant today, as consumers' personal data functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[19]

61.    The FTC has also recognized that consumer data is a new (and valuable) form of currency. In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis—and profit.[20]

62.    Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information that they share and who ultimately receives that information. And, by making the transaction transparent, consumers will make a profit from the surrender of their PII.[21] This business has created a new market for the sale and purchase of this valuable data.[22]

63.    Consumers place a high value not only on their PII, but also on the *privacy* of that data. Researchers have already begun to shed light on how much consumers value their data privacy, and the amount is considerable. Indeed, studies confirm that "[a]mong U.S. subjects,

---

[19]    *See* Julia Angwin and Emily Steel, *Web's Hot New Commodity: Privacy*, The Wall Street Journal, available at http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Mar. 25, 2013).

[20]    *Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable*, (Dec. 7, 2009), available at http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Mar. 25, 2013).

[21]    Steve Lohr, *You Want My Personal Data? Reward Me for It*, The New York Times, available at http://www.nytimes.com/2010/07/18/business/18unboxed.html (last visited Mar. 25, 2013).

[22]    *See Web's Hot New Commodity: Privacy*, http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html.

protection against errors, improper access, and secondary use of personal information is worth US$30.49–44.62."[23]

64.     When consumers were surveyed as to how much they valued their personal data in terms of its protection against improper access and unauthorized secondary use—two concerns at issue here—they valued the restriction of improper access to their data at between $11.33 and $16.58 per website, and prohibiting secondary use to between $7.98 and $11.68 per website.[24]

65.     The value of Plaintiffs' and Class members' PII on the black market is substantial—credit card numbers range in cost from $1.50 to $90 per card number.[25] By way of the Security Breach, Barnes & Noble has deprived Plaintiffs and Class members of the substantial value of their PII, to which they are entitled.

66.     Given these facts, any company that transacts business with consumers and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Damages Sustained By Plaintiffs and Class Members***

67.     A portion of the services purchased from Barnes & Noble by Plaintiffs and Class members necessarily included compliance with industry-standard measures with respect to the collection and safeguarding of PII, including their credit and debit card information. Because Plaintiffs and Class members were denied privacy protections that they paid for and were entitled

---

[23] Il-Horn Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2002) available at http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (emphasis added) (last visited Mar. 25, 2013); Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22 (2) Information Systems Research 254, 254 (June 2011).

[24] *Id.*

[25] *The Cyber Black Market:  What's Your Bank Login Worth*, available at http://www.ribbit.net/frogtalk/id/50/the-cyber-black-market-whats-your-bank-login-worth (last visited Mar. 25, 2013); Office of the National Counterintelligence Executive, *How Much Do You Cost on the Black Market*, available at http://www.ncix.gov/issues/cyber/identity_theft.php (last visited Mar. 25 2013).

to receive, Plaintiffs and Class members incurred actual monetary damages in that they overpaid for the products purchased from Barnes & Noble.

68.     Plaintiffs and other members of the Class have suffered additional injury and damages, including, but not limited to:  (i) the untimely and/or inadequate notification of the Security Breach, which has placed Plaintiffs and Class members at an increased risk of identity theft and/or identity fraud; (ii) improper disclosure of their PII; (iii) loss of and invasion of privacy, and all damages relating thereto that are recoverable at law; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Security Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; (vii) anxiety and emotional distress; and (viii) deprivation of the value of their PII, for which there is a well-established national and international market—for which they are entitled to compensation.

69.     Plaintiffs and Class members suffered additional damages based on the opportunity cost and value of time that Plaintiffs and Class members have been forced to expend to monitor their financial and bank accounts as a result of the Security Breach. Such damages also include the cost of obtaining replacement credit and debit cards.

70.     Barnes & Noble is instructing customers who swiped their cards at any of the Barnes & Noble stores with affected PIN pads to take certain steps. Credit card users should review their accounts for unauthorized transactions and notify their banks immediately if they discover any unauthorized purchases or cash advances. Debit card users should change the PIN numbers on their debit cards, review their accounts for unauthorized transactions, and notify their banks immediately if they discover any unauthorized purchases or withdrawals.

71.     Debit card users will now be required to take the time to change their PIN numbers on their debit cards, and both credit and debit card users will have to closely review and monitor their accounts for unauthorized activity.  Plaintiff and Class members now face a greater risk of identity theft.

## V.     CLASS ACTION ALLEGATIONS

72.     Plaintiffs bring all counts, as set forth below, on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class defined as:

> All persons who made an authorized in-store purchase using a debit or credit card that was swiped through a PIN pad at any one of the following Barnes & Noble stores at any time from November 1, 2010, through and including September 14, 2012:

| Store Address | City | State | Zip |
|---|---|---|---|
| 4735 Commons Way | Calabasas | CA | 91302 |
| 2470 Tuscany Street Suite 101 | Corona | CA | 92881 |
| 2015 Birch Road Suite 700 | Chula Vista | CA | 91915 |
| 313 Corte Madera Town Center | Corte Madera | CA | 94925 |
| 5604 Bay Street | Emeryville | CA | 94608 |
| 810 West Valley Parkway | Escondido | CA | 92025 |
| 1315 E. Gladstone Street | Glendora | CA | 91740 |
| 5183 Montclair Plaza Lane | Montclair | CA | 91763 |
| 894 Marsh St Bldg G | San Luis Obispo | CA | 93401 |
| 2615 Vista Way | Oceanside | CA | 92054 |
| 72-840 Highway 111 Suite 425 | Palm Desert | CA | 92260 |
| 27460 West Lugonia Ave | Redlands | CA | 92374 |
| 1150 El Camino Real Space 277 | San Bruno | CA | 94066 |
| 10775 Westview Parkway | San Diego | CA | 92126 |
| 3600 Stevens Creek Blvd | San Jose | CA | 95117 |
| 11 West Hillsdale Blvd. | San Mateo | CA | 94403 |
| 9938 Mission Gorge Road | Santee | CA | 92071 |

| | | | |
|---|---|---|---|
| 40570 Winchester Rd | Temecula | CA | 92591 |
| 4820 Telephone Road | Ventura | CA | 93003 |
| 1149 S. Main St. | Walnut Creek | CA | 94596 |
| 470 Universal Drive North | North Haven | CT | 06473 |
| 100 Greyrock Place Suite H009 | Stamford | CT | 06901 |
| 60 Isham Road | W. Hartford | CT | 06107 |
| 18711 NE Biscayne Blvd | Aventura | FL | 33180 |
| 333 N. Congress Avenue | Boynton Beach | FL | 33436 |
| 152 Miracle Mile | Coral Gables | FL | 33134 |
| 1900 W International Spdway | Daytona Beach | FL | 32114 |
| 2051 N. Federal Highway | Fort Lauderdale | FL | 33305 |
| 12405 N Kendall Drive | Miami | FL | 33186 |
| 11380 Legacy Ave | Palm Beach Gardens | FL | 33410 |
| 14572 SW 5th St Suite 10140 | Pembroke Pines | FL | 33027 |
| 11820 Pines Blvd | Pembroke Pines | FL | 33026 |
| 5701 Sunset Drive Suite 196 | S. Miami | FL | 33143 |
| 700 Rosemary Ave Unit #104 | West Palm Beach | FL | 33401 |
| 1441 West Webster Avenue | Chicago | IL | 60614 |
| 1130 North State Street | Chicago | IL | 60610 |
| 5380 Route 14 | Crystal Lake | IL | 60014 |
| 20600 North Rand Road | Deer Park | IL | 60010 |
| 728 North Waukegan Road | Deerfield | IL | 60015 |
| 1630 Sherman Avenue | Evanston | IL | 60201 |
| 1468 Springhill Mall Blvd | W. Dundee | IL | 60118 |
| 170 Boylston Street | Chestnut Hill | MA | 02467 |
| 96 Derby Street Suite 300 | Hingham | MA | 02043 |
| 82 Providence Highway | East Walpole | MA | 02032 |
| 395 Route 3 East | Clifton | NJ | 07014 |
| 55 Parsonage Road | Edison | NJ | 08837 |
| 2134 State Highway 35 | Holmdel | NJ | 07733 |
| 4831 US Hwy 9 | Howell | NJ | 07731 |
| 23-80 Bell Blvd. | Bayside | NY | 11360 |
| 176-60 Union Turnpike | Fresh Meadows | NY | 11366 |

| 1542 Northern Blvd | Manhasset | NY | 11030 |
| 160 E 54th Street (Citicorp) | New York | NY | 10022 |
| 2289 Broadway | New York | NY | 10024 |
| 33 East 17th Street (Union Square) | New York | NY | 10003 |
| 555 Fifth Ave | New York | NY | 10017 |
| 2245 Richmond Avenue | Staten Island | NY | 10314 |
| 230 Main St | White Plains | NY | 10601 |
| 97 Warren Street | New York | NY | 10007 |
| 100 West Bridge Street | Homestead | PA | 15120 |
| 800 Settlers Ridge Center Drive | Pittsburgh | PA | 15205 |
| 1311 West Main Road | Middleton | RI | 02842 |
| 371 Putnam Pike Suite 330 | Smithfield | RI | 02917 |
| 1350-B Bald Hill Rd | Warwick | RI | 02886 |

(the "9-State Class").

Excluded from the 9-State Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

73.     In the alternative, Plaintiffs Clutts, Honor, and Winstead bring Counts I, II, and III, as set forth below, on behalf of themselves and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class defined as:

All persons who made an authorized in-store purchase using a debit or credit card that was swiped through a PIN pad at any one of the following Barnes & Noble stores at any time from November 1, 2010, through and including September 14, 2012:

| **Store Address** | **City** | **State** | **Zip** |
| --- | --- | --- | --- |
| 1441 West Webster Avenue | Chicago | IL | 60614 |
| 1130 North State Street | Chicago | IL | 60610 |
| 5380 Route 14 | Crystal Lake | IL | 60014 |
| 20600 North Rand Road | Deer Park | IL | 60010 |

| 728 North Waukegan Road | Deerfield | IL | 60015 |
| 1630 Sherman Avenue | Evanston | IL | 60201 |
| 1468 Springhill Mall Blvd | W. Dundee | IL | 60118 |

(the "Illinois Class").

Excluded from the Illinois Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

74.     In the alternative, Plaintiff Dieffenbach brings Counts I, III, IV, and V, as set forth below, on behalf of herself and as a class action, pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure, on behalf of a class defined as:

All persons who made an authorized in-store purchase using a debit or credit card that was swiped through a PIN pad at any one of the following Barnes & Noble stores at any time from November 1, 2010, through and including September 14, 2012:

| Store Address | City | State | Zip |
|---|---|---|---|
| 4735 Commons Way | Calabasas | CA | 91302 |
| 2470 Tuscany Street Suite 101 | Corona | CA | 92881 |
| 2015 Birch Road Suite 700 | Chula Vista | CA | 91915 |
| 313 Corte Madera Town Center | Corte Madera | CA | 94925 |
| 5604 Bay Street | Emeryville | CA | 94608 |
| 810 West Valley Parkway | Escondido | CA | 92025 |
| 1315 E. Gladstone Street | Glendora | CA | 91740 |
| 5183 Montclair Plaza Lane | Montclair | CA | 91763 |
| 894 Marsh St Bldg G | San Luis Obispo | CA | 93401 |
| 2615 Vista Way | Oceanside | CA | 92054 |
| 72-840 Highway 111 Suite 425 | Palm Desert | CA | 92260 |
| 27460 West Lugonia Ave | Redlands | CA | 92374 |
| 1150 El Camino Real Space 277 | San Bruno | CA | 94066 |
| 10775 Westview Parkway | San Diego | CA | 92126 |

| 3600 Stevens Creek Blvd | San Jose | CA | 95117 |
|---|---|---|---|
| 11 West Hillsdale Blvd. | San Mateo | CA | 94403 |
| 9938 Mission Gorge Road | Santee | CA | 92071 |
| 40570 Winchester Rd | Temecula | CA | 92591 |
| 4820 Telephone Road | Ventura | CA | 93003 |
| 1149 S. Main St. | Walnut Creek | CA | 94596 |

(the "California Class").

Excluded from the California Class are Defendant and its affiliates, parents, subsidiaries, employees, officers, agents, and directors. Also excluded is any judicial officer presiding over this matter and the members of their immediate families and judicial staff.

75.     The 9-State Class, Illinois Class, and California Class are collectively referred to as the "Class," unless specifically indicated otherwise.

76.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

77.     **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** The members of the Class are so numerous that joinder of the Class members would be impracticable. On information and belief, Class members number in the thousands. The precise number of Class members and their addresses are presently unknown to Plaintiffs, but may be ascertained from Barnes & Noble's books and records. Class members may be notified of the pendency of this action by mail, email, Internet postings, and/or publication.

78.     **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.      Whether Barnes & Noble failed to use reasonable care and commercially reasonable methods to secure and safeguard Plaintiffs' and Class members' PII;

b.      Whether Barnes & Noble properly implemented its purported security measures to protect Plaintiffs' and Class members' PII from unauthorized capture, dissemination, and misuse;

c.      Whether Barnes & Noble took reasonable measures to determine the extent of the Security Breach after it first learned of same;

d.      Whether Barnes & Noble's delay in informing Plaintiffs and Class members of the Security Breach was unreasonable;

e.      Whether Barnes & Noble's method of informing Plaintiffs and Class members of the Security Breach (and its description of the breach and potential exposure to damages as a result of same) was unreasonable;

f.      Whether Barnes & Noble's conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.*;

g.      Whether Barnes & Noble provided timely and sufficient notice of the Security Breach under the Illinois Personal Information Protection Act, 815 ILCS 530/10, *et seq.*

h.      Whether Barnes & Noble's conduct herein was deceptive, unlawful or unfair in any respect, thereby violating California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*;

i.      Whether Barnes & Noble's conduct constitutes breach of an implied contract;

j.      Whether Barnes & Noble willfully, recklessly and/or negligently failed to maintain and/or execute reasonable procedures designed to prevent unauthorized access to Plaintiffs' and Class members' PII;

k.      Whether Barnes & Noble was negligent in failing to properly secure and protect its PIN pads and Plaintiffs' and Class members' PII;

l.      Whether by publicly disclosing Plaintiffs' and Class members' PII without authorization, Barnes & Noble invaded Plaintiffs' and Class members' privacy;

m.      Whether Barnes & Noble's conduct violated California Civil Code § 1798.80, *et seq.*;

n.      Whether Barnes & Noble concealed the breach from Plaintiffs and Class members; and

o.     Whether Plaintiffs and the other members of the Class are entitled to damages, injunctive relief, or other equitable relief, and the measure of such damages and relief.

79.     Barnes & Noble engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and the other Class members. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action.

80.     **Typicality—Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of the claims of the other Class members because, among other things, all Class members were comparably injured through Barnes & Noble's uniform misconduct described above and were thus all subject to the Security Breach alleged herein. Further, there are no defenses available to Barnes & Noble that are unique to Plaintiffs.

81.     **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other Class members they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs will prosecute this action vigorously. The Class' interests will be fairly and adequately protected by Plaintiffs and their counsel.

82.     **Insufficiency of Separate Actions—Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated

consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Barnes & Noble. The proposed Class thus satisfies the requirements of Fed. R. Civ. P. 23(b)(1).

83. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).** Barnes & Noble has acted or refused to act on grounds generally applicable to Plaintiffs and the other Class members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Class as a whole.

84. **Superiority—Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Barnes & Noble, so it would be impracticable for Class members to individually seek redress for Barnes & Noble's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.    CLAIMS

### COUNT I
### Breach of Implied Contract

85. Plaintiffs incorporate paragraphs 1–84, as if fully set forth herein.

86. Barnes & Noble's customers who intended to make in-store purchases with debit

or credit cards were required to provide their card's magnetic strip data and PINs (for debit cards)—their PII—for payment verification.

87.     In providing such financial data, Plaintiffs and the other members of the Class entered into an implied contract with Barnes & Noble, whereby Barnes & Noble became obligated to reasonably safeguard Plaintiffs' and the other Class members' PII.

88.     Under the implied contract, Barnes & Noble was obligated to not only safeguard the PII, but also to provide Plaintiffs and Class members with prompt, adequate notice of any security breach or unauthorized access of said information.

89.     Barnes & Noble breached the implied contract with Plaintiffs and the other members of the Class by failing to take reasonable measures to safeguard their PII.

90.     Barnes & Noble also breached its implied contract with Plaintiffs and the other Class members by failing to provide prompt, adequate notice of the Security Breach and unauthorized access of their PII by third-party skimmers.

91.     Plaintiffs and the other Class members suffered and will continue to suffer damages including, but not limited to:  (i) the untimely and/or inadequate notification of the Security Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Security Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and (vii) deprivation of the value of their PII, for which there is a well-established national and international market—for which they are entitled to compensation. At the very least, Plaintiffs and Class members are entitled to nominal damages.

<u>**COUNT II**</u>
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")**
**(and Substantially Similar Laws of the 9-State Class)**

92.    Plaintiffs incorporate paragraphs 1–84, as if fully set forth herein.

93.    Plaintiffs and the other members of the Class were subjected to Barnes & Noble's unfair conduct in failing to properly implement adequate, commercially reasonable security measures to protect their PII while shopping at Barnes & Noble.

94.    Barnes & Noble intended for Plaintiffs and the other members of the Class to rely on Barnes & Noble to protect the PII furnished to it in connection with their credit and debit card transactions in such a manner that the transactions would be protected, secure, and not susceptible to access from unauthorized third parties.

95.    Barnes & Noble instead handled Plaintiffs' and the other Class members' PII in such a manner that it was compromised.

96.    Barnes & Noble either willfully ignored its obligations to Visa and other PCI members in failing to follow industry best practices concerning data theft, or was negligent in preventing such data theft from occurring when it allowed the Security Breach to occur.

97.    It was foreseeable that Barnes & Noble's willful indifference or negligent course of conduct in handling Plaintiffs' and Class members' PII would put that information at risk of compromise by data thieves.

98.    Barnes & Noble benefited from not taking preventative measures that would have prevented the data from being compromised, because Barnes & Noble saved on the cost of those security measures.

99.    Barnes & Noble omitted these material facts from Plaintiffs and Class members regarding the inadequate security of its PIN pad devices

100. Barnes & Noble's omissions were intended to induce Plaintiffs' and the other Class members' reliance on the fact that their PII was secure and protected when using credit and debit cards to shop at Barnes & Noble.

101. Barnes & Noble violated 815 ILCS 505/2 of ICFA by failing to properly implement adequate, commercially reasonable security measures to protect Plaintiffs' and the other Class members' PII and by failing to inform Plaintiffs and Class members of these material facts.

102. Barnes & Noble's acts or practice of failing to employ reasonable and appropriate security measures to protect Plaintiffs' and Class members' PII and failing to promptly notify consumers individually of the Security Breach, constitute separate violations of the Federal Trade Commission Act, 15 U.S.C. § 45(a).

103. Barnes & Noble's conduct constitutes unfair acts or practices, as defined in 15 U.S.C. § 45(a), because Barnes & Noble caused substantial injury to Plaintiffs and Class members that is not offset by countervailing benefits to consumers or competition or reasonably avoidable by consumers.

104. Barnes & Noble's conduct, as set forth herein, also constitutes unfair conduct, which is an independent violation under ICFA.

105. Barnes & Noble's lack of adequate security of its PIN pads despite industry recommendations to the contrary, the resulting Security Breach and theft of Plaintiffs' and Class members' PII, and the lack of notice to Plaintiffs and Class members regarding the Security Breach, all constitute unfair practices under ICFA.

106. Barnes & Noble's conduct offends public policy and is immoral, unethical, oppressive, and unscrupulous.

107.     Barnes & Noble also violated 815 ILCS 505/2 by failing to immediately notify affected customers of the nature and extent of the Security Breach pursuant to the Illinois Personal Information Protection Act, 815 ILCS 530/1, *et seq*., which provides:

> Sec. 10. Notice of Breach.
>
> (a) Any data collector that owns or licenses personal information concerning an Illinois resident shall notify the resident at no charge that there has been a breach of the security of the system data following discovery or notification of the breach. The disclosure notification shall be made in the most expedient time possible and without unreasonable delay, consistent with any measures necessary to determine the scope of the breach and restore the reasonable integrity, security, and confidentiality of the data system.

108.     815 ILCS 530/20 provides that a violation of 815 ILCS 530/10 "constitutes an unlawful practice under the Consumer Fraud and Deceptive Business Practices Act."

109.     Plaintiffs and the other members have suffered injury in fact and actual damages including lost money and property as a result of Barnes & Noble's violations of 815 ILCS 505/2, including, but not limited to:  (i) the untimely and/or inadequate notification of the Security Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Security Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; and (vii) deprivation of the value of their PII, for which there is a well-established national and international market—for which they are entitled to compensation. At the very least, Plaintiffs and Class members are entitled to nominal damages.

110.     Plaintiffs' and the other Class members' injuries were proximately caused by Barnes & Noble's fraudulent and deceptive behavior, which was conducted with reckless indifference toward the rights of others, such that an award of punitive damages is appropriate.

111.    Through its conduct, Barnes & Noble violated the substantive consumer protection and unfair deceptive trade practices acts or statutes of each of the states of the 9-State Class.

**COUNT III**
**Invasion of Privacy By Public Disclosure of Private Facts**

112.    The preceding factual statements and allegations are incorporated herein by reference.

113.    Plaintiffs' and Class members' PII was (and continues to be) private information.

114.    Barnes & Noble's failure to secure and protect Plaintiffs' and Class members' PII directly resulted in the public disclosure of such private information.

115.    Dissemination of Plaintiff's and Class members' PII is not of a legitimate public concern; publicity of their PII would be, is, and will continue to be offensive to Plaintiffs, Class members, and other reasonable people.

116.    Plaintiffs and Class members were (and continue to be) damaged as a direct and/or proximate result of Barnes & Noble's invasion of their privacy by publicly disclosing their private facts (*i.e.*, their PII) in the form of, *inter alia*:  (i) the untimely and/or inadequate notification of the Security Breach; (ii) improper disclosure of their PII; (iii) loss of privacy; (iv) out-of-pocket expenses incurred to mitigate the increased risk of identity theft and/or identity fraud pressed upon them by the Security Breach; (v) the value of their time spent mitigating identity theft and/or identity fraud and/or the increased risk of identity theft and/or identity fraud; (vi) the increased risk of identity theft; (vii) deprivation of the value of their PII, for which there is a well-established national and international market; and (viii) anxiety and emotional distress—for which they are entitled to compensation. At the very least, Plaintiffs and the Class members are entitled to nominal damages.

117. Barnes & Noble's wrongful actions and/or inaction (as described above) constituted (and continue to constitute) an invasion of Plaintiffs' and Class members' privacy by publicly disclosing their private facts (*i.e.*, their PII).

### COUNT IV
### Failure to Protect Security of Private Information
### (Violation of California Civil Code §§ 1798.80, *et seq.*)

118. Plaintiff Dieffenbach incorporates paragraphs 1–84 and 93–106, as if fully set forth herein.

119. Barnes & Noble, as a corporation, is a "business" within the meaning of California Civil Code § 1798.80(a).

120. Plaintiff Dieffenbach and each member of the California Class are "individuals" within the meaning of California Civil Code § 1798.80(c).

121. Section 1798.82 of the California Civil Code provides, in pertinent part, as follows:

> (a) Any person or business that conducts business in California, and that owns or licenses computerized data that includes personal information, shall disclose any breach of the security of the system following discovery or notification of the breach in the security of the data to any resident of California whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person. The disclosure shall be made in the most expedient time possible and without unreasonable delay, consistent with the legitimate needs of law enforcement, as provided in subdivision (c), or any measures necessary to determine the scope of the breach and restore the reasonable integrity of the data system.

> (b) Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person.

> (c) The notification required by this section may be delayed if a law enforcement agency determines that the notification will impede a criminal investigation. The notification required by this section shall be made after the law enforcement agency determines that it will not compromise the investigation.

> (d) Any person or business that is required to issue a security breach notification pursuant to this section shall meet all of the following requirements:

(1) The security breach notification shall be written in plain language.

(2) The security breach notification shall include, at a minimum, the following information:

(A) The name and contact information of the reporting person or business subject to this section.

(B) A list of the types of personal information that were or are reasonably believed to have been the subject of a breach.

(C) If the information is possible to determine at the time the notice is provided, then any of the following: (i) the date of the breach, (ii) the estimated date of the breach, or (iii) the date range within which the breach occurred. The notification shall also include the date of the notice.

(D) Whether notification was delayed as a result of a law enforcement investigation, if that information is possible to determine at the time the notice is provided.

(E) A general description of the breach incident, if that information is possible to determine at the time the notice is provided.

(F) The toll-free telephone numbers and addresses of the major credit reporting agencies if the breach exposed a social security number or a driver's license or California identification card number.

* * *

(f) Any person or business that is required to issue a security breach notification pursuant to this section to more than 500 California residents as a result of a single breach of the security system shall electronically submit a single sample copy of that security breach notification, excluding any personally identifiable information, to the Attorney General. A single sample copy of a security breach notification shall not be deemed to be within subdivision (f) of Section 6254 of the Government Code.

(g) For purposes of this section, "breach of the security of the system" means unauthorized acquisition of computerized data that compromises the security, confidentiality, or integrity of personal information maintained by the person or business. Good faith acquisition of personal information by an employee or agent of the person or business for the purposes of the person or business is not a breach of the security of the system, provided that the personal information is not used or subject to further unauthorized disclosure.

122. The credit card and debit card information of Plaintiff Dieffenbach and California

Class members that was provided when they swiped their cards at Barnes & Noble's PIN pads

constitute computerized data that includes PII that is maintained by, but not owned by, Barnes &

Noble. Section 1798.82 (b).

123.    Barnes & Noble's failure to have reasonable measures in place to secure its PIN

pads was willful, intentional, reckless, and/or grossly negligent.

124.    California law gives the protection of its citizens' privacy the highest priority.

Article 1, Section 1 of the California Constitution states:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing and protecting property, and pursing and obtaining safety, happiness and *privacy*.

(emphasis added).

125.    California's common law and statutory scheme also recognizes and protects

California residents' right of privacy. For example, California Civil Code § 1798.81.5(a) states:

> It is the intent of the Legislature to ensure that personal information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own or license personal information about Californians to provide reasonable security for that information.

126.    Further, § 1798.81.5(c) also requires a business that discloses private information

to third parties to contractually require the third party to implement and maintain reasonable

security procedures and practices to protect the private information from security breaches.

127.    California citizens' rights to privacy have been compromised and infringed by the

acts and omissions of Barnes & Noble, as described herein.

128.    Under § 1798.84 of the California Civil Code:

> (a) Any waiver of a provision of this title is contrary to public policy and is void and unenforceable.

> (b) Any customer injured by a violation of this title may institute a civil action to recover damages.

> (c) In addition, for a willful, intentional, or reckless violation of Section 1798.83, a customer may recover a civil penalty not to exceed three thousand dollars ($3,000) per violation; otherwise, the customer may recover a civil penalty of up to five hundred dollars ($500) per violation for a violation of Section 1798.83.

\*       \*       \*

(e) Any business that violates, proposes to violate, or has violated this title may be enjoined.

129.    As a result of Barnes & Noble's violation of Cal. Civ. Code § 1798.82, Plaintiff Dieffenbach and the other California Class members incurred economic damages, such as expenses for credit monitoring and, in some cases, the loss of use of their credit card or debit card.

130.    California citizens' rights to privacy have been compromised and infringed by the acts and omissions of Barnes & Noble, as described herein.

131.    Plaintiff Dieffenbach, individually and on behalf of the California Class, seeks all remedies available under Cal. Civ. Code § 1798.84, including, but not limited to: (a) damages suffered by Plaintiff Dieffenbach and the other California Class members, as alleged above; (b) statutory damages for Barnes & Noble's willful, intentional, and/or reckless violation of Cal. Civ. Code § 1798.83; and (c) equitable relief.

132.    Plaintiff Dieffenbach also seeks reasonable attorneys' fees and costs under Cal. Civ. Code §1798.84(g).

## <u>COUNT V</u>
**Violations of the Unfair Competition Act, Business & Professions Code § 17200, *et seq.***

133.    Plaintiff Dieffenbach incorporates paragraphs 1–84 and 93–106, as if fully set forth herein.

134.    Plaintiff Dieffenbach brings this claim under the Unfair Competition Act (UCL), California Business & Professions Code § 17200, *et seq.*, on behalf of (i) herself; (ii) the California Class.

135.    California Business & Professions Code § 17200, *et seq.* provides that unfair practices include, but are not limited to, "any unlawful, unfair or fraudulent business act[s] or

practice[s]."

136.    By and through its conduct, as described herein, Barnes & Noble engaged in activities that constitute unlawful, unfair and fraudulent business practices prohibited by California Business & Professions Code § 17200, *et seq.*

137.    Barnes & Noble has committed acts of unfair competition, including those described above, by engaging in a pattern of "unlawful" business practices within the meaning of California Business & Professions Code § 17200, *et seq.* Specifically, Barnes & Noble's conduct violates California Civil Code § 1798.80, *et seq.*, as well as the other statutes described above.

138.    Barnes & Noble knew or should have known at the time it learned of the Security Breach that failure to provide timely notice of the breach to Plaintiff Dieffenbach and the California Class was unlawful, unfair, and fraudulent.

139.    The harmful impact upon members of the general public and Plaintiff Dieffenbach and the California Class resulting from Barnes & Noble's conduct, as described herein, far outweighs any reasons for justifications by Barnes & Noble.

140.    Barnes & Noble had improper motives (as alleged herein) in failing to provide timely notice of the Security Breach to Plaintiff Dieffenbach and the California Class. The utilization of unlawful, unfair, unconscionable and/or deceptive practices was and is under the sole control of Barnes & Noble.

141.    As an individual whose PII was the subject of a data security breach by Barnes & Noble, and as a member of the general public in California, Plaintiff Dieffenbach is entitled to and does bring this class action seeking all available remedies under the UCL, including declaratory relief, injunctive relief, and restitution.

142.    As a direct and proximate result of Barnes & Noble's unfair, fraudulent and

unlawful business practices, Plaintiff Dieffenbach and the California Class have suffered economic and non-economic damages, as described above. Plaintiff Dieffenbach is informed and believes and based thereupon alleges that Barnes & Noble will continue to engage in unfair, unlawful, and fraudulent business practices.

143.    As a result of Barnes & Noble's conduct, Plaintiff Dieffenbach and the California Class seek declaratory, injunctive and restitutionary relief and compensatory and damages.

## VII.  <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury of all claims in this complaint so triable.

## VIII.  <u>REQUEST FOR RELIEF</u>

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Barnes & Noble, Inc., as follows:

A.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiffs as Class Representatives and appointing Ben Barnow, Barnow and Associate, P.C., and Joseph J. Siprut, Siprut P.C., as Co-Lead Counsel for the Class;

B.    Ordering Barnes & Noble to pay actual damages to Plaintiffs and the other members of the Class;

C.    Ordering Barnes & Noble to pay punitive damages, as allowable by law, to Plaintiffs and the other members of the Class;

D.    Ordering Barnes & Noble to pay statutory damages, as provided by the Illinois Consumer Fraud and Deceptive Business Practices Act and other applicable State Consumer Fraud Acts, and maximum statutory penalties under Cal. Civ. Code § 1798.84(c), to Plaintiffs and the other members of the Class;

E.    Ordering Barnes & Noble to disseminate individualized notice of the Security Breach to all Class Members and to post notice of the Security Breach in all of its affected stores;

F.    Ordering Barnes & Noble to pay attorneys' fees and litigation costs to Plaintiffs;

G.      Ordering Barnes & Noble to pay both pre- and post-judgment interest on any amounts awarded; and

H.      Ordering such other and further relief as may be just and proper.

Date:  March 25, 2013                            Respectfully submitted,

Ray Clutts, Heather Dieffenbach, Jonathan Honor, and Susan Winstead, individually and on behalf of all others similarly situated,

*/s/ Ben Barnow*
Ben Barnow
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504
b.barnow@barnowlaw.com

*/s/ Joseph J. Siprut*
Joseph J. Siprut
SIPRUT PC
17 North State Street, Suite 1600
Chicago, IL 60602
Tel: (312) 236-0000
Fax: (312) 878-1342
jsiprut@siprut.com

*Plaintiffs' Interim*
*Co-Lead Counsel*

Aron D. Robinson
LAW OFFICE OF ARON D. ROBINSON
180 W. Washington Suite 700
Chicago, Illinois 60602
Tel: (312) 857-9050
Fax: (312) 857-9054
adroblaw@aol.com

Adam J. Levitt
GRANT & EISENHOFER P.A.
30 North LaSalle Street, Suite 1200
Chicago, IL 60602
Tel: (312) 214-0000
Fax: (312) 214-0001
alevitt@gelaw.com

Julie D. Miller
COMPLEX LITIGATION GROUP LLC
513 Central Avenue, Suite 300
Highland Park, Illinois 60035
Tel: (847) 433-4500
Fax: (847) 433-2500
Julie@complexlitgroup.com

William A. Baird
MARKUN ZUSMAN & COMPTON LLP
Sunset Blvd., Suite A380
Pacific Palisades, California 90272
Tel: (310) 454-5900
Fax: (310) 454-5970
tbaird@mzclaw.com

*Plaintiffs' Executive Committee*

## <u>Certificate of Service by Electronic Means</u>

The undersigned hereby certifies that the preceding document was caused to be served electronically this 25th day of March 2013 with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Ben Barnow_____
Ben Barnow
BARNOW AND ASSOCIATES, P.C.
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504
b.barnow@barnowlaw.com